

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

IN THE ESTATE OF: NORMA JEAN )
MEYER, DECEASED, DUSTIN MEYER, )
PERSONAL REPRESENTATIVE, )
  )
    Appellant, )
  )
    v. )    WD77903
  )
ROBERT S. PRESLEY, TRUSTEE OF THE )    Opinion filed: September 8, 2015
NORMA J. MEYER REVOCABLE LIVING )
TRUST AGREEMENT, AND ROBERT S. )
PRESLER, A/K/A TOMMY EARL )
RICHARDSON, )
  )
    Respondents. )

### APPEAL FROM THE CIRCUIT COURT OF COOPER COUNTY, MISSOURI
### The Honorable Richard P. Beard, II, Judge

Before Division One: Cynthia L. Martin, Presiding Judge,
Joseph M. Ellis, Judge and James E. Welsh, Judge

Dustin Meyer, acting in his capacity as personal representative for the Estate of Norma J. Meyer, appeals from a judgment entered in the Circuit Court of Cooper County declaring that the assets of the Norma J. Meyer Revocable Living Trust were not assets of the Estate of Norma J. Meyer. The trial court rejected Appellant's arguments that the Trust had been created as a result of undue influence on the part of

Tommy Richardson or, in the alternative, that the Trust had been terminated by Norma J. Meyer[1] prior to her death. For the following reasons, the judgment is affirmed.

In 2001, when Norma first met Richardson at a bar in Jefferson City, she was married to Paul Meyer, with whom she had three children (Lisa Brinkley, Steve Meyer, and Jeffrey Meyer) and multiple grandchildren. Norma and Richardson immediately became involved in an intimate relationship. Shortly thereafter, Norma and Paul separated, and Norma and Richardson began living together. Eventually, Paul and Norma divorced in 2003. After the divorce, Norma stopped visiting or calling her children on a regular basis, and the children made little effort to maintain contact with her.

With proceeds from the divorce, in November 2003, Norma purchased approximately 300 acres of farmland in Cooper County upon which she intended to operate a ranch with Richardson. She soon purchased livestock and began farming/ranching operations on the property. She built a home on the ranch and moved there with Richardson.

On July 19, 2005, Norma executed the Trust, which had been drafted by St. Louis attorney James Anding at her direction. The trust named Norma as trustee and provided that she would be succeeded as trustee by Richardson[2] upon her death. The trust language provided that, upon Norma's death, Richardson was to receive the ranch property and Norma's daughter, Lisa Brinkley, was to receive all of the personal

---

[1] Because a significant number of the individuals involved in this case share the same last name, we will refer to them by their first names throughout this opinion. In so doing, we intend no disrespect.

[2] The language of the Trust uses the name "Robert Pressler" instead of Tommy Richardson to refer to Richardson. This was an alias that Norma helped Richardson assume within the first month of their relationship. She even helped Richardson create a fake Michigan birth certificate in that name. The trial court found that to Norma, Robert Pressler and Tommy Richardson were one and the same person and that, in using the name Robert Pressler in the Trust, Norma was referring to Richardson. This finding has not been challenged on appeal.

2

property placed in the Trust. Norma also executed a pour-over will, also drafted by Anding, at that time. Norma subsequently transferred the ranch to the Trust by warranty deed executed on August 29, 2005, and recorded on March 13, 2006. She also transferred certain personal property and title to her motor vehicles to the Trust.

In May 2006, Norma decided to end her relationship with Richardson. She enlisted the assistance of the Cooper County Sheriff's Department in asking Richardson and the ranch's other employees to leave the premises and not return. While on the property and performing a consent search, the Sheriff's department found marijuana in the rim of Richardson's cowboy hat and a birth certificate he had forged for himself, with Norma's aid, in the name of Robert Pressler. Richardson was arrested and was eventually convicted of one count of forgery, for which he received a sentence of five years probation, subject to a special condition that he not have any further contact with Norma. Richardson did not have any further contact with Norma aside from complying with a request from her that he pick up his personal property from the ranch at a designated time when she was not present.

On September 23, 2009, Norma executed a will that had been prepared by Jefferson City attorney Mike Riley at her direction. The Will generally provided that Norma's property should be divided between Lisa Brinkley and Jeffery Meyer. The Will made no mention of the Trust, nor did it specifically reference any property owned by the Trust.

Norma died on August 16, 2011. Letters testamentary were granted to Jeffrey Meyer on March 14, 2012. Subsequently, Jeffrey, acting as personal representative of the Estate, filed a Petition for Discovery of Assets against Richardson, individually and

3

as Trustee of the Norma J. Meyer Revocable Living Trust.[3]  The petition averred that Richardson had exerted undue influence over Norma and that, by executing her 2009 Will, Norma had intended to revoke the Trust.  It asked the court to enter a judgment finding that the Trust was revoked in its entirety and that all assets conveyed to the Trust should be deemed to be assets of the Estate.  After filing the action, Jeffrey died, and his son, Dustin Meyer, was named Personal Representative of the Estate.

The case was tried to the court in June and July 2014.  The trial court subsequently entered its judgment finding that there was no clear and convincing evidence to support a claim that the Trust was created as the result of undue influence on the part of Richardson.  It further found that the record did not contain sufficient evidence to support the Estate's claim that Norma had revoked the Trust.  In so finding, the court noted that "Norma attempted to change the terms of her testamentary directives, but circumstances combined to create a miscommunication between her and her attorney, so that in the end, she made a new will but failed to revoke her trust." Appellant brings two points on appeal.

"This case involves a proceeding for discovery of assets, which is authorized under section 473.340, and is essentially a search for assets belonging to a decedent at his or her death."  ***In the Estate of Lambur***, 397 S.W.3d 54, 62 (Mo. App. S.D. 2013). "In such a proceeding, the court's role is to determine whether specific property has been adversely withheld from the estate."  ***Id***. (internal quotation omitted).  "Upon the trial of the discovery of assets action, the 'court shall determine the persons who have an interest in said property together with the nature and extent of any such interest.'"  ***In***

---

[3] The petition also named Brinkley as a defendant based upon her status as a beneficiary of the Trust. Brinkley, however, sided with the Estate in the case.

*the Estate of Herbert*, 152 S.W.3d 340, 345 (Mo. App. W.D. 2004) (quoting *§ 473.340.3*).  If the court "determines that the property belongs to the estate, it shall order the transfer of the title or possession, or both, to the estate."  *Id*. (citing *§ 473.340.3*).

"The standard of review in a discovery of assets proceeding is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)."  *Id*. at 344.  Accordingly, "[t]he judgment will be sustained unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law."  *In re Estate of Hock*, 322 S.W.3d 574, 579 (Mo. App. S.D. 2010).  "We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences."  *Salem United Methodist Church v. Bottorff*, 138 S.W.3d 788, 790 (Mo. App. S.D. 2004).  "Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness."  *Id*.

In his first point, Appellant contends that the trial court erred in finding that Norma had not revoked her 2005 Trust.  He argues that the evidence showed that Norma intended for the 2005 Trust to be revoked when she executed the 2009 Will and that she should be deemed to have waived the Trust's requirement that any revocation be made "by instrument in writing executed by Settlor and delivered to the Trustee."

With regard to the revocation of a revocable trust, § 456.6-602.3 provides:

> The settlor may revoke or amend a revocable trust:
> (1) if the terms of the trust provide a method of amendment or revocation, by substantially complying with any method provided in the terms of the trust; or
> (2) if the terms of the trust do not provide a method, by any other method manifesting clear and convincing evidence of the

5

> settlor's intent, including the terms of a later duly probated will or codicil that identify the trust being revoked or the trust terms being amended.

Accordingly, where, as here, "the terms of the trust provide a method for amendment, the Settlor may amend the trust only by substantially complying with the method provided in the terms of the trust." *Banks v. Central Trust & Inv. Co.*, 388 S.W.3d 173, 176 (Mo. App. E.D. 2012) (citing *§ 456.6-602.3*).

Norma's 2005 Trust specifically provides that Norma, as the Settlor, reserved the right during her lifetime to revoke the Trust "by instrument in writing executed by Settlor and delivered to the Trustee."[4]  The Trust goes on to provide that "[t]he manner provided in this Item for altering, amending  and/or revoking this Agreement, as the case may be, shall be the exclusive method for such alteration, amendment or revocation, notwithstanding any contrary provision of applicable law."  Thus, under the terms of the Trust, in order to revoke the Trust, Norma was required to (1) execute a written instrument revoking the trust and (2) deliver that written instrument to the Trustee.  Norma is presumed to have known the terms of the 2005 Trust and, therefore, to have been aware of these requirements.[5]  *Rouner v. Wise*, 446 S.W.3d 242, 254 (Mo. banc 2014).

Where, as here, "'the settlor reserves a power to modify the trust only in a particular manner or under particular circumstances he [or she] can modify the trust only in that manner or under those circumstances.'"  *Banks*, 388 S.W.3d at 176-77 (quoting *In re Estate of Mueller*, 933 S.W.2d 903, 907 (Mo. App. E.D. 1996)); *see also In re*

---

[4] Similarly, the Trust reserved to the Settlor the authority to amend, alter, or modify the Trust "by instrument in writing executed by Settlor and delivered to and executed by the Trustee."
[5] Similarly, Norma executed the deed transferring ownership of the ranch to the Trust and is, therefore, presumed to know that she did not personally own that property.

6

*Gene Wild Revocable Trust*, 299 S.W.3d 767, 774 (Mo. App. S.D. 2009); *In re Thomas L. Harris Trust*, 204 S.W.3d 267, 271 (Mo. App. S.D. 2006); *Salem United Methodist Church*, 138 S.W.3d at 794; *Maple Tree Invs. v. Port*, 821 S.W.2d 562, 564 (Mo. App. W.D. 1991); *Love v. St. Louis Union Trust Co.*, 497 S.W.2d 154, 159 (Mo. banc 1973).

The 2009 Will, while expressly revoking all previous wills and codicils, makes no mention of the 2005 Trust or trusts in general.[6] Nothing contained therein can be interpreted as having revoked the 2005 Trust. Indeed, Appellant concedes on appeal that "[n]o written instrument was in evidence in which Norma explicitly revoked the 2005 trust."

Appellant argues, however, that Norma had the authority to waive all of the revocation requirements set forth in the Trust and that she should be deemed to have done so based upon extrinsic evidence presented at trial regarding her intent in executing the 2009 Will. He contends that testimony that Norma told the attorney drafting her 2009 Will that she wanted "everything" to go to Lisa and Jeffrey proved that she wanted the property held by the Trust to go to them and that she intended for the Trust to be revoked. He argues that, since Norma never explicitly stated in writing that she was revoking the trust, it should be inferred that she waived the written instrument requirement.

---

[6] We further note that there is no apparent inconsistency between the 2005 Trust and the 2009 Will. The 2009 Will divided any property owned by Norma at the time of her death, on a percentage basis, to Lisa and Jeffrey. The 2009 Will revoked and replaced Norma's 2005 Will, which was a spillover will executed to deal with the property personally held by Norma outside of the Trust at the time of her death. The 2009 Will does not specifically reference any property held by the Trust, and Norma never made any attempt to convey title to the property held by the Trust back to herself. Thus, as written, the 2009 Will only applies to property owned by Norma at the time of her death and would not apply to property owned by the Trust. Accordingly, the provisions of both the 2005 Trust and the 2009 Will may be carried out without any apparent conflict.

7

While the requirement of **delivery** of the written instrument by the settlor to the trustee may be for the trustee's benefit and might arguably be waivable by the trustee under certain circumstances, *see **St. Louis Union Trust Co. v. Dudley***, 162 S.W.2d 290, 293 (Mo. App. E.D. 1942), a question we need not and do not decide herein, the other requirements for revocation are most certainly not waivable and must be satisfied to effectuate the revocation of a trust. **Maple Tree Invs.**, 821 S.W.2d at 564. The requirement that any amendment to or revocation of the trust be effectuated through a written instrument executed by the settlor serves a very significant purpose. It protects the integrity of the trust, operating similarly to the Statute of Frauds. By requiring a written instrument for any amendment or revocation, the Trust insures that challenges like the present one, attempting to avoid and/or alter the provisions of the Trust through the use of parol evidence and hearsay, are precluded. Were we to allow a party challenging a trust to overcome the written instrument requirement in the manner prescribed by Appellant, the provision would be rendered meaningless.

Since the record does not contain a written instrument revoking Norma's 2005 Trust, the trial court did not err in finding that Appellant failed to prove that the Trust was revoked. Point denied.

In his second point, Appellant claims that the trial court erred in finding that the record did not contain clear and convincing evidence that the Trust was created as a result of undue influence on the part of Richardson. He contends that "the evidence presented at trial required the trial court to find that Richardson exerted undue influence over Norma to cause her to execute the 2005 trust." Appellant argues that he presented sufficient evidence to establish a *prima facie* case of undue influence; that

8

Richardson, therefore, bore the burden of rebutting the presumption of undue influence; and that Richardson failed to adequately rebut that presumption. He claims that the trial court's finding is, therefore, against the weight of the evidence.

"Undue influence . . . is usually defined as such overpersuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another." *In re Estate of Hock*, 322 S.W.3d at 579 (internal quotation omitted). "[E]ven when evidence of influence over the settlor is shown, it does not amount to undue influence unless it removed the settlor's free agency." *Cima v. Rhoades*, 416 S.W.3d 320, 325 (Mo. App. E.D. 2013). The task before the trial court is to resolve the evidence and determine as a matter of fact whether the Trust was executed as a result of such influence. *Id*. The party challenging the validity of the will or trust at issue bears the burden of proving undue influence. *Id*. at 324.

"[A] presumption of undue influence arises in discovery of assets cases where substantial evidence shows (1) a confidential and fiduciary relationship; (2) benefaction to the fiduciary; and (3) some additional evidence from which undue influence may be inferred." *In re Estate of Hock*, 322 S.W.3d at 579 (internal quotation omitted). The import of this presumption was analyzed by the Eastern District of this Court in *Watermann v. Eleanor E. Fitzpatrick Revocable Living Trust*, 369 S.W.3d 69, 75-76 (Mo. App. E.D. 2012), which noted:

> Through the use of this presumption, Missouri places a prima facie case requirement upon the party alleging undue influence which once satisfied, allows the party to submit the case to the jury. Thus, in a jury-tried case, the court is required to determine if the plaintiff made a prima facie case when the defendant makes a motion for directed verdict at the close of plaintiff's case or at the close of all evidence. Further, when a plaintiff makes a prima facie case in a jury-tried case, the

9

presumption does not disappear upon the introduction of rebutting evidence; rather, it raises an issue for the jury.

However, in a court-tried case, the trial court is not as concerned with the question of a 'prima facie case' as it is in a jury-tried case. In a court-tried case, the court has considerable discretion in the taking of evidence and in determining the order of the evidence, and it may hear all of the evidence before ruling on the case. Further, even if a plaintiff makes a prima facie case, this does not mean that the plaintiff is entitled to recover. The fact that a plaintiff's evidence, if believed by the trial court, would make a prima facie case is not determinative on appeal.

(internal citations and quotations omitted). "Therefore, in court-tried cases, the court need not specifically evaluate whether the contestant met the elements giving rise to a presumption of undue influence, but rather must only determine the ultimate question of fact: whether the trust was the result of undue influence that deprived the settlor of his or her free agency." *Cima*, 416 S.W.3d at 324.

Where the trial court has made a factual finding regarding undue influence in a court-tried case, this Court's task is limited to reviewing the trial court's ultimate conclusion according to our standard of review, simply determining whether it is supported by substantial evidence and/or is against the weight of the evidence. *Id*. In making that determination, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the judgment and to disregard all contrary evidence and inferences. *Salem United Methodist Church*, 138 S.W.3d at 790. Furthermore, the "[c]redibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness." *Id*.

In advancing his argument that the trial court erred in finding that Appellant failed to sufficiently prove undue influence, Appellant disregards our standard of review -- he accepts as credible the evidence he presented at trial, disregards evidence favorable to

Richardson, and draws inferences favorable to himself. When properly viewed, however, the trial court's finding is clearly not against the weight of the evidence.

"The mere existence of a confidential relationship is not sufficient to compel a finding of undue influence." *Watermann*, 369 S.W.3d at 76. "There must be facts and circumstances tending to show that undue influence was an active factor in the [challenged] transaction." *Id.* (internal quotation omitted). Furthermore, "[i]t is not undue influence for the beneficiary to exercise influence as long as it was not so coercive or importunate as to deprive the benefactor of his or her free agency." *Id.* (internal quotation omitted).

Anding, the attorney who drafted the Trust for Norma, testified that Norma had contacted him for estate planning services after being referred to him by her financial advisor, Greg Reynolds. He testified that Norma asked him to draft a revocable trust for her and that nobody else provided him with any direction related to the creation of the Trust. Anding stated prior to the execution of the Trust he had spoken with Norma multiple times on the phone and had met with her personally at her ranch on one occasion. Anding testified that Richardson was not present for his meeting with Norma at the ranch and that he never received any instructions from Richardson related to the Trust. Anding said that Norma had told him that she was leaving her children out of the Trust because she felt her children would be adequately taken care of by their wealthy father.[7] Anding testified that during his interactions with Norma he never had any reason to doubt her competence or intelligence and that he never thought that she was

---

[7]Andings notes, which were entered into evidence, reflect that Norma told him that her divorce from their father had affected her relationship with her children. The notes further reflect that she told Anding that she intended to disinherit her children, not because she didn't love them but because they would be adequately taken care of as beneficiaries of an irrevocable $30,000,000 trust that had been created by their father and their share of father's remaining estate.

under the influence of any third party with regard to making decisions related to the Trust. Anding stated that after his meeting with Norma, she had asked him to explain the terms of the Trust and how it worked to Richardson. Anding indicated that Richardson merely listened to the explanation of how the Trust would work and did not ask any questions or instruct Anding in any way. Anding testified that he subsequently met with Norma at a bank in Columbia, Missouri where she executed the Trust after discussing its provisions with him for approximately three hours.

Richardson testified that, prior to their break-up, he and Norma had shared a dream of running a ranch and growing old together on it. Richardson testified that, prior to Norma's meeting with Anding on the ranch, he and Norma had never discussed her creating a trust. He stated that, after Norma met with Anding, she had summoned him to the house where she and Anding had explained to him that Norma was leaving the farm to him in a trust and was also "doing some wills and stuff."

Richardson testified that, subsequently, at Norma's request, he had driven her to a bank in Columbia, Missouri to meet with her attorney. He testified that he waited for her in the bank while Norma and her attorney conferred until he was eventually summoned into the conference room where Anding and Norma explained the documents Norma had executed to him. Richardson testified that he never forced or compelled Norma to do anything regarding the Trust and will she executed in 2005. The trial court was entitled to believe the testimony of Anding and Richardson and to find that the evidence did not establish that Richardson had asserted any undue influence over Norma in the creation of the Trust.

Appellant points to evidence that Norma stopped seeing her children and grandchildren shortly after her divorce and did not begin seeing them again until sometime after Richardson left the ranch. He argues that it was unnatural for her to leave property to her lover over her own children. He further makes much of the fact that Richardson was present on the ranch when Norma met with her attorney and was present at the bank when she executed the trust. Appellant also relies on testimony that there were guns in the house and that Norma was generally fearful of Richardson. From this evidence, Appellant argues that the only reasonable conclusion is that Richardson exerted undue influence over Norma and substituted his will for her own in the creation of the Trust. The trial court was not required to believe any of the evidence or testimony relied upon by Appellant and, even if it found it to be credible, was not required to afford it any weight or to draw the inferences relied upon by Appellant. *Salem United Methodist Church*, 138 S.W.3d at 790.

Viewing the evidence in accordance with our standard of review, the trial court's finding that Appellant failed to prove that Richardson exerted undue influence over Norma in the creation of her trust is not against the weight of the evidence. Point denied.

The judgment is affirmed.

_____
Joseph M. Ellis, Judge

All concur.

13